and Gilbert Lopez. Mr. Zimmerman. May it please the court, I represent Gil Lopez in this appeal. Our position is that the exclusion of the expert CPA's testimony denied Mr. Lopez his right to present a defense, and that defense was lack of criminal intent. The expert's opinion would have made a difference because Mr. Lopez himself is not a CPA, and the expert testimony would have revealed that Mr. Lopez's actions were reasonable at the time, and his testimony made sense in the context of the accounting world. Because the expert would have testified that Mr. Lopez satisfied his duty under the accounting profession's ethical standards and professional requirements when he recommended disclosure of the loan to shareholder in the annual report, and he wasn't required to go to the authorities or to quit or to whistleblow according to the professional standards. Second, he would have testified that Mr. Lopez was not the one responsible for the accuracy and content of the annual report, and he would reach that conclusion after studying thousands of documents that had been provided to him by us through discovery from the government. And we rely on a case that we cite in our reply brief at page 7, the Brickey case, that talks about if a circumstance impeaching a government witness, say Circumstance A, is combined with another circumstance that impeaches that witness, which is B, and the jury apparently believes that witness anyway, if you add a Circumstance C, it's possible then that the jury would not believe him. And in this case, A would be impeaching Mr. Davis because of his terrible character for truthfulness. B would be that he was testifying under a very generous plea agreement. And then so if you take A and B and they believe him despite those, but you add the expert's testimony in that supports Mr. Lopez, that Circumstance C, and as Brickey said, they might not believe him when you add those together. Can you help me with this? Yes, ma'am. I thought that the government's theory is not that the defendant just failed to report, but that the defendant actually engaged in fraud. And so whereas if the thing was about failing to report as a criminal violation, and then it seems to me that your argument is much better if that was the theory of the government. You know, it's a criminal violation to fail to report, but you can say, oh, the CPA rules say you don't have to do this, so it's ethical, and then that would help your case. But if the theory is that your client's actively engaged in the fraud, not just failing to do a CPA duty, then it seems that your case is less strong. So help me out there. Yes. Your Honor, I'm sure the government's going to answer that question themselves, but I believe that the government's theory was that the way that Mr. Lopez and Mr. Curt furthered the fraud was by not revealing this loan to shareholder and this huge amount that it accumulated over many years, up to $2 billion, and that, to use their phrase, the accountants were actively participating in the fraud behind the scenes by not reporting it to anybody and not revealing it to any investors or revealing it to anybody. Their case rests, in your view, solely on the failure to report the loan? I think it's a major part, Judge. I don't think it's solely on that, but that is . . . Because they keep saying that's not it. They keep saying that's not what they're relying on, that they're not saying that the duty to disclose is the lick log of the whole case. I think what they're saying is their failure to take action is what they're faulting Mr. Lopez. Okay, but the action would be disclosing. Yes. Okay. So they're saying it's not a duty to disclose case. You're saying it is, and therefore the expert becomes sort of prominent because the experts say there is no duty to disclose. That's right. That's one . . . I mean, this isn't an ethics case. This is a criminal case. Exactly. So the duty to disclose or not comes from the criminal laws of the United States, not the accounting rules of ethics. It's clearly unethical what they did, in my view, but the question is, was it a violation of the federal statute? So how can this expert help us with that? By putting in context what Mr. Lopez did and what he didn't do, because he's an . . . Dr. Duran was an expert, and by excluding his testimony, he basically took away Mr. Lopez's defense that he didn't act with criminal intent, that there was no criminal intent. It's uncontested that he recommended disclosure. There's some dispute about whether they agreed to that or not. The testimony was that Mr. Stanford, the owner and the CEO and the highest guy in the organization, said that that note didn't need to be disclosed because the companies were all private and they weren't publicly held, and it was not necessary. A non-criminal reason to not report it, so . . . And the jury heard all that, right? Yeah, the jury heard that, yes, but they didn't hear it from an expert. It would have mattered had they heard it from someone with good credentials in the field and that might have helped persuade the jury. Absolutely. I'm unclear why it was excluded. I don't know why it was excluded. We thought that it was not going to be excluded, pretrial rulings, but when it actually came to trial . . . That's why the pretrial rulings seem to say that they would be able to do this, and so it's odd to me. Was there something going on that I can't tell from what I've read that would tell me why at the last minute that it would be excluded? We think that that's where the trial court committed error, Judge, by changing that ruling, but the answer was that after he heard part of the trial, he changed his ruling. But back to the defense being the lack of criminal intent, is that Mr. Davis admitted that he . . . And he testified he didn't know what was in Mr. Lopez's mind, and if . . . I would ask this question. If Mr. Lopez was really involved intentionally in this massive scheme and acting behind the scenes, why would he have recommended disclosure in the first place? Why would he have recommended disclosure in the first place? And the rejection of expert advisory notes to the Federal Rule. But it's a very . . . it's an area of broad discretion in the trial court. That is correct, Your Honor. That is correct. Judge Haynes' question earlier said something about whether or not this was clearly unethical or not. Would this accountant, the CPA, have said it was not unethical to not disclose? He said if he had not recommended it, it would have been unethical. But he satisfied his superior. Mr. Lopez is not a CPA. So that was his full duty. Yes. And I'm looking at the clock, if it pleases the Court. I would just say that the exclusion of this expert testimony compounded the deliberate ignorance instruction error that lowered the government's burden of proof on criminal intent. And if I may, I'll transition to that deliberate . . . Why are people continuing to give the deliberate . . . haven't we said over and over again that you're not supposed to give that instruction unless that's the theory of the case and they've quit giving that instruction? You have said that, but I'll answer your question. They keep doing it because nobody reverses the cases. If you reverse a case, the trial courts would do that. That is the law. That's what you've said clearly. Do you have any particular case in mind that we might do that on? This one, sir, Your Honor. Was a theory of your case that . . . I mean, was one of the theories that there was deliberate ignorance? Is there evidence of deliberate ignorance in this record? We don't believe there was evidence to support it. We attacked it on two bases. One, we attacked giving it at all because we didn't think there was any support for that. But two, and I'd like to focus on this, we think that the instruction that was given was not as appropriate as the one we proposed because for twenty-something years this court has said that there are two requirements before you give a deliberate ignorance instruction. There has to be a subjective awareness of illegal conduct and then there has to be a conscious effort to avoid learning. Can you help me to make sure that you didn't weigh this by proposing one? Did you say, oh, well, if you're going to . . . we object to you giving one, but if you're going to give one, you have to give this language? Is that . . . it's been properly preserved in every respect? Absolutely. We objected to that being . . . anyone being given because we didn't think it applied and then we also . . . Well, but isn't the case law . . . there is a lot of case law on this whole subject, but isn't it all uniform that if there is evidence of actual knowledge, it is harmless error, even if it shouldn't have been given? And that's why people aren't reversing. There are cases like that which, quite frankly, Judge, I think needs to be clarified because what it says is . . . Yeah, but we're bound by that. Whether that's a good line of cases or not, we're bound by that. And so if that's the law, I mean, then we're back to this question of whether there's evidence of actual knowledge and we've got your expert argument and all of that. Did those cases say that automatically if there's some evidence of knowledge . . . or did they say under the facts of those cases it was not error, it was not a harmful error? I think what they say is it's error, but it could be harmless error to give it . . . So does it mean it's automatically harmless error anytime there's knowledge or does it mean that under the facts of those cases it was harmless error? I think that that's what's intended, but of course I'm not . . . I didn't sit on that panel, but we would ask you to give some instructions to the trial court. Is this supposed to be used sparingly? Haven't we already done that? I'm sorry. I'm sorry. The government argues that it is this IB-5 thing where both of the defendants in this case said, oh, we didn't really read it, yeah, we had it, we didn't really read it, and so on, and that that's what gave rise to the need for and the reason for the deliberate ignorance. So what's your response to that? The law is clear that the illegal conduct or the fact that's supposed to be able to be inferred by this instruction has to be an element of the offense charged. Mr. Lopez was not charged with defrauding the Antiguan authorities. That IB-5 report went to the FSRC. That's an Antiguan situation. Our argument is, is that that wasn't illegal conduct that addressed the charges against Mr. Lopez, and it's not an element of the wire fraud or the conspiracy to commit wire fraud that he was charged with. I see that my red light's on, and may I take 30 seconds out of my rebuttal to argue very briefly on the last issue that I would like to address this morning, and that's the procedural error in sentencing. We believe there's no support in the record for a loss figure of $2 billion. The government filed a motion saying that it was unreasonably difficult to find how much the restitution was. They couldn't identify the individual losses. Therefore, they couldn't identify the total loss. Well, if they can't identify it for restitution, how can the court just pick a number out of the air and use the $2 billion? It's a dramatic change in the guidelines range. 30 levels were added for using the $2 billion figure. 16 would have been the $2 million level, and it's clear that the trial court at page 96 of the supplemental sentencing record explains why he varied 13 levels down. Our position would be that he should have used gain, and it would have made a very significant difference down to changing the guidelines when you add the 13-level variance downward to 51 to 63 months, and we have a chart at page 25 of our brief that sets that up, and we rely on the Delgado-Martinez issue, I mean, case for this issue. I don't see my red lights on, so please support. I  think I can embrace or answer some of the questions that Judge Haynes put to Mr. Zimmerman as I present the argument. Can you tell me, if I want to go at the record and look at the specific questions and answers that you feel were improperly excluded, what would be the best place for me to focus? Absolutely. That would be the lengthy, individual, Daubert hearing. I want to cite. Let me pull it in my brief. If you want to give it to me. I'll give it to you in rebuttal. In rebuttal. I apologize. I don't have the exact... I just, I want to... Sure. I mean, there's been a lot. I've read a lot. I've looked at a lot, but I want to focus in on not just this general sense of exclusion, but the specific questions and answers that were... Sure. ...that you think are the real heart of what was. Absolutely. I apologize. I don't have the U.S.A. 5 number in front of me, but where it is, Judge Haynes, and I'll get the exact number, is about 100 pages that began when Mr. Kuniansky called Mr. Jones to the stand. At that point, Mr. Vornadoe said, oh, excuse me, Judge, I think we need to approach. And what the judge did is said, we'll go late into the evening and identify these various issues. I've reproduced most of them on page 55 of my brief. And then he said, we'll take, you know, question by question. And then they put on Mr. Jones for some proffer. They had a little bit of cross-examination. This went well into 7 o'clock in the evening. And it went issue by issue. So that's exactly where the proffer is, Judge Haynes. And we went in excruciating detail. I think Judge Elrod, the question Judge Elrod asked Mr. Zimmerman that I want to address, where she said, tell me why is it that this expert was excluded, I would point out that in Judge Haynes, the very beginning of this 100 pages, where it went late into the evening after they had this Daubert hearing, Judge Hittner even said to Mr. Vornadoe and Mr. Goldberg, I warn you, you don't want to stuff the defendants into too narrow of a channel. He even made a joke, I'm not going to be the one who's going to suffer, you are, when I have to retry the case. That's basically a direct quote. Judge Hittner warned them that they were playing with fire here. But the harm analysis, Judge Elrod, why was this excluded at the trial court, I don't know why it was excluded other than the fact that Judge Hittner felt that Mr. Vornadoe was more convincing than we were, obviously. But the harm here is how this came up. I was not counsel of record for the trial. I was there for substantial parts of the proceeding. We had no idea this was coming. If you just put on my page 55, my chart, where I take Judge Hittner's October 1st order, he said permissible if it relates to general knowledge. He said may consider reasonable knowledge in the industry, permissible if it relates to certain knowledge. He said I'm going to have to take this question by question, that's fine. The way this worked, Judge Elrod, the paradigm we were in, we walked into the court ready to call Mr. Jones. I don't disagree with Judge Hittner's original order. He said Mr. Jones cannot testify to things that are classic lay witness. What exactly they did at the company. It seemed very reasonable. Yes, yes. And of course you can't obviously go to Rule 704, you can't say they had the intent, or didn't, of course. That was just classic, hornbook evidence rulings. And then, Your Honor, I thought this issue had been very much decided, because most of the government's pretrial briefing, their deliberate motion, they did lengthy responsive, they were bearing down on two major points. First, they did not want Mr. Jones to testify by proxy. In other words, don't have Curt or Lopez tell him something and then, you know, say, well, that, of course, issue had gone away because by the time we called Mr. Jones, Mr. Curt had already testified. So they had ample opportunity to cross-examine Mr. Curt. So that issue went away. The other, of course, whether or not Mr. Jones would rely on admissible hearsay, another Rule 704 type issue, that was cured because we had Mr. Jones sit through 99% of the trial. He sat in the courtroom. He didn't sit through a couple of the CD owner victims. He was there. So there are major concerns the government enunciated before. That had been completely taken care of. We had no idea this was going to happen. In my brief, I said Mr. Curt was hamstrung. Mr. Vornado's brief didn't like that. I said, the word hamstrung, instead at the trial, we said our cart was cut out or we're going to call him for it. Whatever organ-based metaphor Mr. Vornado wants me to use, that's the problem. But we're here now. Yes. So I think your time is best spent telling us how your client was prejudiced by what was particularly included. Absolutely. Yes, absolutely. Because I'm feeling like there's just this generality and even your chart and everything is very general. What is the bottom line here? What did tear your heart out or whatever? Yes, absolutely. I would answer it this way, Your Honor. In any trial, the jury's final determination is necessarily binary. It's guilty or not guilty. But in any trial, the trial of this length of size and this number of exhibits and the jury's deliberations about that evidence is necessarily that of a multiple equilibria. The way the evidence stood at this time is a direct answer to your question, Judge Haynes. Mr. Davis had testified there was this meeting in Memphis and they told me we needed to disclose it and we all agreed not to disclose it. That was his version of the facts, fine. And Mr. Curt had testified there was no such meeting and we told him that he needed to disclose it and he said no because we're not a public company and you're overruled. Okay? So those are the two competing factual versions of the world that were presented for the jury, a classic jury determination. The problem, though, Judge Haynes, with exactly where we're harmed, is that because Mr. Jones was not allowed to testify as to the disclosure of the shareholder loan, not the existence of the shareholder loan, but as to its disclosure, everyone knows it should have been disclosed, but what was the response? And this is the difference to the question you asked Mr. Zimmerman, Judge Elrodic. Yes, they weren't charged with misprision of a felony or not disclosing something, but the criminal intent. Could the jury infer criminal intent from the fact that there was not a resignation? What's the response? And Mr. Jones said you did not have to. I get all that, but we're ignoring the fact that it seemed to me your guy was integrally involved in all of these convoluted land flips that were allowing the books to appear to have money that wasn't there. Kind of similar to what happened in, I guess, the 80s in the Dallas area where they were getting these inflated, flipping things so that loans seemed to be secured by actual property. So in kind of a similar way, it's my understanding Mr. Curt, at least if you believe the government's evidence, was the linchpin of setting up this, okay, we'll pretend like this property that's really worth $60,000 is worth $2 billion or whatever it is in Antigua, and we'll do this. And he was part of those schemes. That's not just failing to disclose a loan. That is actively insisting in the fraud. How do you answer that? Because that seems to be the giant elephant in the room that hasn't been discussed in this oral argument yet. Sure. Let me answer it in two – I certainly do want to address it. Let me answer it in two prongs. The first is if he was so integrally involved, then of course giving the deliberate blindness instruction was necessarily an error. But with regard to the sufficiency of the evidence point, Your Honor, that was other, of course, evidence, testimony we wanted to adduce from the expert. The issue with the islands transaction, the Jumbie Bay, and valuing it at this other amount, the expert's report was clear that that was – by all indications, by review of the evidence, that that was a placeholder value. In other words, not only was the expert not a real estate appraiser, not only was Mr. Curt not a real estate appraiser, Mr. Davis said as a placeholder, put in this comparable that was never designed to be the final number, the one that was actually used, was never publicly disseminated. But it was the only time that was done because it seems like there's some other accounting magic going on throughout this time. Sure. Well, yes. That's the most egregious version of it, but, you know, there was other accounting magic that kept this company alive on paper a lot longer than it should have been. Sure. Well, let me address that. The answer to your question, Judge Haines, at one level of analysis, yes, that was the only island-type transaction. The word flip, which Mr. Davis never used in his interviews with the FBI, which was never used in the earlier trial of Alan Stanford, this idea that assets at points in time – some asset was taken, sold from the bank to Mr. Stanford, and at some later point Mr. Stanford transferred that money back to the bank and the loan was written down by a certain amount. You have to understand, though, that there was a venture cap, Stanford venture cap, which was based out of Florida, which, at least for purposes here, was an internal valuation arm of the company, approved every single one of those, and there was no contention that that was an inflated or adulterated type of transaction. In other words, it wasn't the situation that I think you're talking about with the 2004, the 2005 transactions, which we're calling flip in the nomenclature that the government liked at trial. The government never brought any evidence that Stanford venture cap was somehow corrupt when they assigned these values. Maybe these private equity investments did increase in value quite a bit. I don't know much about private equity myself. There wasn't a lot of people making a lot of money doing it. Sometimes there's rapidly escalating values to these private equity investments. The engine change, very importantly, is that it is a perfectly legitimate accounting principle. Even the government let our expert, they didn't challenge, that you can write down, reduce a debt obligation like the loan Stanford had taken by accepting property. It does not only have to be in the form of cash to reduce a debt obligation. Give me an example of the type of question you would have liked to have asked that the judge did not allow you to ask. Oh, absolutely. And it's in the record where Mr. Kunansky's like, Judge, I really can't get into this, right? Yes, of course. That's what I said last night. The number one issue there, Judge Prado, is going to be our obligations with regarding the having been overridden about the nondisclosure of the loan. It was like I said, you had the two competing views of the facts. What are your obligations once you're overridden? Yes. Do you have like a duty to tell the world or something like that? In the case of nothing else, when do you have a duty to resign? I don't dispute Judge Delrado's. I'm sure Mr. Vornhose is going to point out they were not charged with misprison of a felony. Agreed. Okay. The question is what is in the paradigm of conspiracy to commit wire fraud and wire fraud, what are the fair, reasonable inferences from the evidence that one did not, did or did not take a certain course of action when they were overruled about the loan? That's the catalytic thing. Would your CPA have said they did not have a duty to resign? Oh, yes. Absolutely. He says that. I have his whole report. That's what he says in the report, and that's what he said at the Daubert. Oh, yes. Absolutely. That they did not have a duty to resign, and they didn't have a duty to go tell the world that he fulfilled his duty once the decision was made not to report. In extraordinary detail, Your Honor. Of course, the first report was about the first indictment. That's the answer to the question? Exactly. Yes. Absolutely. That is exactly what his testimony was. And he even distinguished at the earlier trial of Allen Stanford, there was a separate account of Mr. Hollander, who actually opined that he thought the entire loan was legitimate. So did any other witness establish that he did not have a duty to resign besides the excluded testimony? I'm trying to see if the evidence was being cumulative. No. I mean, there's no doubt. There's no evidence in the record from any sort of outside authority figure that they had no duty to resign. I don't believe, and I'll check some of it. No, that's okay. That's not authority. That's why we needed expert testimony. So that's a very important point to show that he had no duty to do anything different than what he was already doing. That's your theory of the case? Yes. That's our theory, and that's why we needed an expert to testify on it. All the other people, Mr. Amadeo, however you say his name, Mr. Rocha, so forth, I've seen Mr. Davis, these were all people who were testifying, of course, as lay witnesses. Every day I worked there, I saw them do or not do various things. The critical element, whether or not there was circumstantial evidence from which a jury could fairly infer criminal intent, that is what, Your Honor, we contend we needed the expert testimony for. What Judge Hittner had agreed pretrial we were entitled to do. Why we were shocked when this came up, when he renewed, Mr. Vorniger renewed this objection right when we called Mr. Jones. And if the government wants to still argue that I waived it as they did in their brief, I point out when Judge Hittner announced his order the next morning, right when we were getting ready to call Mr. Jones, that's when Mr. Kuniansky said, Judge, maybe I shouldn't call and try him at all, call him at all. You cut out the heart I was going to call him for. And if there's any doubt that anyone knew this was a dangerous, dangerous issue, I'll get the exact page site, Judge Haynes. Judge Hittner even said you don't, said Mr. Vorniger, you don't want to stuff these people down too narrow of a channel so you could create a reversible issue. And it's our contention today that they were stuffed down that channel and Mr. Court's defense was forcibly drowned.  Mr. Leonardo. Yes, Your Honor. May it please the court. Good morning. My name is Jason Varnado. I'm one of the prosecutors who tried the case below in the district court. Okay. So did you get a little greedy on the expert by excluding evidence that we're going to now have to send back for a retrial? We did not, Your Honor. And I'll explain it as follows. Judge Hittner's initial pretrial ruling was very deliberate and it was also conditional. I don't care about that. I care about the ultimate bottom line of what was admitted and what wasn't. I don't care whether he changed his mind. I understand trials are dynamic. I couldn't care less. So the question is, was this evidence about no duty to disclose central to the defense's case such that its exclusion requires us to reverse? No, Your Honor. Okay, why not? The notion of duty and failure to disclose is a complete red herring. To begin with, the issue that this is a valid loan is false from its first premise. This money that Mr. Stanford was taking from his own bank for years that the defendants knew about, he never had an intent to repay. The only repayments were through these sham private equity transactions that the defendants were engaged in. To credit this taking of money as a loan is a false premise to begin with. Second, the— That they're involved in? That they're involved in. Absolutely, Your Honor. From the year 2000 when Mr. Lopez is a controller and Mr. Curt is an accounting manager, soon to be assistant controller, they are actively engaged and familiar with and indeed tracking the monies taken by Mr. Stanford, stolen by Mr. Stanford, and they are keeping track of where it's going. Would the accountant have opined about whether it was a loan or not? I don't believe they would. I don't think any of that's in their reports at all about whether or not it's a true valid loan, and it's clear, and we argued this to the jury. Let's say that, in fact, at this meeting in Memphis or whatever, they had decided to disclose it and the information about these loans had been put in shareholder-type disclosures or whatever the paperwork is that's relevant here. Would that have changed the outcome of this case? In other words, would you still be pursuing these guys for fraud? Absolutely. Okay, so why, then, why? I mean, isn't the fact that people were misled into thinking this company had higher solvency and therefore investing in these CDs and whatever the problem, the overall reason the whole Stanford empire collapsed and we're here today? The overall problem is that Stanford International Bank represented that it was going to take CD depositor money and invest it in safe, conservative, and liquid investments, and it also mentioned, and we don't engage in any loans other than CD depositors who are borrowing their own money back, and that the shareholder reinvests every dollar into the bank. Those representations have been made since the year 2000, while the defendants were responsible for preparing the annual reports. The change in accounting standards that sort of raises this disclosure issue is really immaterial because those same representations were made before the accounting standards changed, which would have, you know, they agreed they called for disclosure, and they continued after. The defendants the entirety of the time were part of this conspiracy, misrepresenting the manner in which CD depositor money was being used because it was not being invested safely. This $2 billion that Mr. Stanford stole was being put into risky side projects, his personal piggy bank to buy him planes and yachts and his fascination with cricket. They not only knew it, they tracked exactly where the money went. They knew it, they had a crystal clear idea of exactly how the money was being misused. In many instances, they admitted their guilt in this case because they had to concede. Government Exhibit 1599 is the shareholder funding reports, and it details exactly where the $2 billion went, and it went to places that were in direct contravention of all the banks' representations of how it would use CD depositor money, both before the change in accounting standards and after. But they're not responsible for making it go to those places, and so if they're tracking it and then they're not supposed to report it, then what have they done wrong? Well, and let me be clear, Judge Elrod, this case is not . . . Because they're not making the money off of it. They're the most poorly compensated people in this whole deal, and they've been sentenced to the highest possible sentences of anyone, except Mr. Stanford. Mr. Stanford did get 110 years, and I would say everybody . . . Yeah, but other than Mr. Stanford, they've gotten the highest sentences, and they're only making a little $200-something when these people are getting $16 million. They're not getting any money off of this deal. And I would say, Judge Elrod, that may very well go to motive. I don't think it goes to their guilt. I can certainly speak to that. I would say they were engaging . . . Well, I want to know how they're guilty if they're just tracking money, and they don't have a duty to report it, and they're not getting the money. How are they . . . why isn't it relevant to have the accountants testify to that, and why are they guilty? How are they guilty? Let me be clear. They are not . . . this case was not about . . . they didn't disclose a loan. They didn't quit when they were, quote, overruled. This case is about them actively working behind the scenes as accountants to further and to conceal Robert Allen Stanford's theft of this money, and they did this through sham transactions that were private equity flips that falsely inflated assets to make it appear . . . It wasn't just the Antiguan property. I mean, they did this all for 10 years. Absolutely not, and I'm going to run down a litany of things that the defendants did with the court's permission, and these private equity flips are critical because Governance Exhibit 1543 is an email from Harry Failing to Jim Davis copying Gil Lopez where he discusses really the plan is being hatched of how to treat this money that Stanford is just pilfering from his bank, and he says, we're going to come up with the notion of a note for, quote, cosmetic purposes so that the IRS will not think that this is taxable income to Stanford. Mr. Lopez is on that email, and he is in the meeting where this is discussed. Mr. Lopez's testimony at page 6529 of the transcript says I . . . Mark Kerp is in that meeting too. These men know as of 2000 that this whole notion of a note and a loan is just semantics to trick the IRS into not taxing Mr. Stanford for the money that he was quite clearly using for himself. So what if they knew? Well, they're actively taking steps to fool the IRS with these private equity flips in November of 2004. What steps are they taking to fool? You haven't shown me the fact that they're keeping up with the money doesn't show that they are designing the transactions or benefiting from the transactions. The fact that they keep up with the transactions and then want to know how to properly report them does not tell me that they were involved in the transactions. Keeping up with where you're putting the money doesn't say you're directing the money. They're doing far more than keeping up with where the money is going. Wish, tell me what they're doing. The private equity flips, they are the architects of how this gets done. Mark Kerp draws up the plan and the flow charts, and then they execute it in the bank's accounting books and records. With respect to the phantom capital contributions, this is in the fall of 2008, Mark Kerp directs Rolando Roca to enter a $200 million capital contribution into the bank's books and records. He tells Rolando Roca to then later enter a $541 million capital contribution. These contributions are bogus. They're supported by nothing other than Mr. Stanford's stated desire to have a billion dollars of equity in the bank. After those contributions are made, Mr. Lopez verifies in Government's Exhibit 1187 fictitious financial statements that are going to be released publicly. These are the men who are carrying out the instructions on how to treat the bank's books and records. Would the accountants have testified as to whether or not the statements were fictitious or not, whether they were appropriate? I don't know how they could testify because it's a fact question of what, you know, was it really a capital contribution made? No, that's exactly what an accountant would testify. They would say the statement is proper under accounting rules or not. And so that's very pertinent to whether if you're going around saying these statements are all fictitious and blah, blah, blah, then they would want to come in and say, well, no, the accountant did what the accountant's supposed to do, and they checked the numbers, and they offered to disclose, and this is what the accountant's job is, and they're not responsible for this other stuff. And they didn't really offer the expert on that side of testimony. They attempted a little bit with this real estate transaction that was so fanciful, which was going to be this, and this was the transaction that Mr. Curt and Mr. Lopez drew up the spreadsheet on of how to orchestrate it, and it was going to wipe the slate clean so no one would have discovered Mr. Stanford's theft. Why did you play with fire? I'm sorry? Why did you play with fire? If you believe that the evidence is so overwhelming, why were you playing with fire? This is a mystery to me, that when the government gets instructions that are possible reversible error, it seems . . . I don't understand why you play close to the edge with the fire. Why don't you just cross-examine these experts? Well, I'll tell you, Judge, we really did not view that we were playing close to the edge. Judge Hittner told you you were before it happened, and so that would seem a very learned judge, one of the most learned judges around, tells you you were up against the edge, and you're the government. Why don't you stay well within the lines? We viewed that the issue of an accounting duty was merely a straw man being raised by the defendants for the reason of introducing improper expert testimony to knock it down. Then let him. Then cross-examine him. Well, and at some point, and I'll tell you, Judge, they offered an expert on 16 different topics, and that's in Mr. Kurtz's brief at page 55. And the court in this instance carefully examined in two different hearings all of those topics, and he allowed testimony on twelve of them. What was improper that you objected to with regard to the experts? That their opinion was not valid? Were you challenging their expertise? Were you challenging that you disagreed with their opinion? Were you saying that it was not relevant to the issues? Exactly why did you object to the testimony of these experts? And there's a range of reasons. Judge Prado, I'm going to focus on the two reasons that Mr. Lopez has cited and that the court seemed concerned about. First off, they offered the expert Duran and Jones to talk about Mr. Lopez was a nominal chief accounting officer who did not have responsibility for the bank's content and accuracy of the bank's financials. Well, Mr. Duran is just not competent to testify about that. Mr. Zimmerman just referenced that, oh, he reviewed thousands of government pages of databases and things of that nature. On that particular point— Did the government sustain the objection that he was an incompetent witness? Is that what the basis of the exclusion was? No, he was not competent to talk about that issue because it's a fact issue. I mean, did the judge say, I sustain an objection that he's unqualified to talk about that? That's not the basis of the exclusion. No, Your Honor, and I don't mean to suggest it was his qualifications. It was the fact that the issue on which he was seeking to opine, he did not have reliable information. He said that that opinion was based exclusively on 43 weekly status reports, which are like timesheets between the years— Did the court exclude it because it wasn't reliable? Was that the basis for the exclusion? That was the argument we made. What was the basis for the exclusion? The court didn't specifically state the rule under which it was excluding that particular testimony. But we argued under 702 that it just didn't meet the criteria, that it wasn't reliable because these status reports were not— An expert can't come in and tell you who is what player at the company is what you basically were saying. Correct. And particularly— But what about this issue of the duty disclosed? Because I know you all think that's a red herring because you don't think duty disclosed is the case. But they seem very fixated on that. So from the pigs get fed, hogs get slaughtered standpoint, why wouldn't you just let them come in and say there's no duty disclosed? And then you guys come in and say it's not about duty disclosed. It's about land flips and la, la, la. Well, and, Your Honor, that was a strategic decision, and I still stand by that because I think the answer to inadmissible testimony isn't to just admit it and then cross-examine. That was a clear attempt— Can you stand by that today? I do— That was the smartest thing to do when you're standing here arguing before us. Well, I don't know about smartest, but I would—I'm not saying it was the smartest thing. I'm just saying. It was a reasonable approach. Tell me what is wrong with the question about the duty to disclose. I understand what's wrong with the thing about what their role at the company is and all that. That's not an expert thing. But the duty to disclose as an accountant is something these experts know about. Why not allow that? What's the reason? What is the horrific thing that will happen if that's allowed that would keep it out? Our position was they—first off, there was no defined duty. This isn't like the Cavan case they cite, which I think is their best case, where there's clear attorney ethical obligations that are canonized. There's ethical opinions. This was not—they just kept saying this amorphous, undefined accounting duty that they had satisfied, and it was just merely confusing to the jury, particularly— I think 403, confusing the jury on the ultimate issue, absolutely, was a danger here. And I believe the defendants intended to raise this issue for that very purpose. It would also be irrelevant if you're saying duty to disclose is not your case, then you think it's irrelevant. It is. It would be, Your Honor. Did you argue that? Confusion and irrelevant. We did. Confusion and irrelevant. We did. We argued this, and I'll give Judge Haynes the site she was looking for. The Daubert hearing during trial was at USCA 5, 195 through 300. Did the government disagree with the opinion that was going to be given by the expert? I would say we did, Your Honor. I mean, was there a duty to disclose? I guess we just thought the entire issue was irrelevant. I disagree. This is a very important point. I think we did, Your Honor. You didn't articulate that. We did, and we argued that it was not material to what was going on in the case and that it was not an issue before the jury. It's not the same thing. What Judge Prado asked you is do you disagree with the opinion the expert would have said that there was no ethical duty under the accounting rules? We're not in a position to agree or disagree. I don't want to not answer your question because he never explained what accounting rule they were talking about. There was no rule, no duty. So you're saying you feel like the whole thing was made up? I do, absolutely, Your Honor. And therefore just lacked any credibility, lacked any relevance, lacked any expertise underneath it?  And I would use this analogy. Is it this Ipsy-Dixit kind of problem because there's nothing underlying? In other words, was the problem that the expert couldn't point to literature, model rules of accounting conduct or whatever that might support that? Because, for example, the attorney rules do say if you are a supervised attorney and you go to your supervising attorney and there is a gray area of law and the supervising attorney gives you an opinion that it's okay to do this, then that is okay if it's gray. I mean it doesn't blanket you for everything. Are you saying there's an absence of that on the accounting side of that kind of rule that would have allowed the expert to have a basis, a foundation? Certainly no rule was articulated that they relied upon. And so we continue to say, no literature, no nothing. And that was a big fundamental part of our problem. And I would also say a lot of Judge Hittner's initial rulings were not only made preliminary and he said, hey, I may reverse myself. I might change myself around. But some of this testimony, Judge Elrod, you seem troubled of why it was excluded. He said it's contingent upon the government arguing that inaction, their inaction is a basis for their guilt. We did not argue that. We did not argue they're guilty because they didn't do something, because they didn't disclose. We argued that they actively worked behind the scenes to keep the law. Specifically, so if you were on the elevator telling somebody about your case, what would you tell them on the elevator from floor 10 to 1 was the worst thing these guys did? So you don't have much time. Tell me what it is. The worst thing they did was to try to cover up all of the misdeeds they had done in the late December of 2008. But what are the misdeeds that these guys, Lopez and Kurt, did? That they engaged in sham accounting entries to show false prepayment of a so-called loan in order to fool the IRS. That they engaged in phantom cooking the books of entering capital contributions that were never actually made in order to deceive investors in the fall of 2008 when the financial crisis was at its apex into believing that the bank had a billion dollars in equity when, in fact, it did not. And this was done with the known purpose of slowing the flow of redemptions so that depositors wouldn't remove their money. And then, finally, they engaged in a bogus real estate transaction to falsely inflate a parcel of land worth $63.2 billion to $3.2 billion in an effort to sweep it all under the rug, keep anyone from finding out, wipe out the monies taken by Stanford, and purportedly show a billion dollars in equity. And then those statements were released to the public and to employees that there was, in fact, a billion dollars of equity. I'm confused a little bit about, it may not matter, but the point that they couldn't talk about who was doing what at the corporation, that that wasn't the purpose of expert testimony or something, the first thing that was excluded. Why isn't that appropriate? You know, case agents do that all the time when they're doing about drug empires. That's exactly what they spend the first day on the bench talking about. These are the players, and this is what they do, and that's expert testimony that the government routinely offers. So why can't they offer somebody to explain what they're—to educate the jury on how the whole thing works? I think if they were offering their expert to say, I've looked at the Fortune 500 companies, 50 of them, and in general this is what a chief accounting officer does, that would be fine. They wanted to go one step further and say, but that's not what happened here. Here's what Mr. Lopez actually did, and so he didn't have responsibility for that. And that's too far. But they didn't get to do the first part, did they? I don't know that they tried. They certainly could have tried that approach. They just could not go the extra step. That wasn't excluded, the idea of how companies generally work. In fact, that's what Judge Hittner said. He said you can talk about that. You just can't talk about what happened in this case. And Mr. Jones did testify about a number of these issues, and again— You know the agents, though, offer pretty specific testimony about this kind of deal. The drug dealer does this, and this is the leader, and while some cartels do it this way, and this one, the brother does more, and the nephew, and explain the different roles and how some people let them handle the money and some people want to cut the drugs all themselves. There are all sorts of different ways that cartels do these things, and the agents testify specifically about how they run. I think they do that in the abstract about organizations, and that would be akin to the testimony about how, in general, a CAO would do this at these Fortune 500 companies. You just can't go further and say that Mr. Lopez didn't have such and such responsibility in this case, particularly when— That becomes a fact witness, and they're not fact witnesses because they weren't there. Correct. And the fact witnesses that did testify, Mr. Rocha, who's Mr. Lopez's underling, said he did have responsibility for the bank's books and records, and Mr. Lopez's supervisor, Mr. Davis, also said the same thing, and they worked there. Let me shift gears to the deliberate ignorance point. Oh, I'm sorry. You said earlier that part of your case was to show that they covered up and didn't disclose, but then they had an expert that was going to say that they had no duty to disclose, so wouldn't that be relevant and important to your theory of the case that you said that they were covering up things that they had some accountant that said under accounting principles or process there was no duty to disclose? Let me be clear what I say, and that's an excellent question, Judge Prado, as to what I mean by keeping it secret. Not just inactivity, but by affirmatively lying to other members of the Stanford organization about the existence of the monies taken by Mr. Stanford. If you read the defendants' briefs, you might think, well, this $2 billion, everybody knew about it. Almost no one knew about it. The defendants were among a handful of people out of the thousands and thousands of employees at the Stanford empire who knew about Mr. Stanford's misuse and takings of this $2 billion. And certainly none of the 30,000 customers knew about it. And so when we say keeping it secret, there's a specific instance. Mr. Rocha, when he's hired, he asks Mr. Curt, well, how are all these other companies funded? And Mr. Curt lies to him and says, oh, it's Mr. Stanford's personal wealth. He lies to him. He knows that the money is coming from the bank, but he lies to Mr. Rocha. Mr. Lopez is asked by Luis Garcia, the auditor, when he first starts, Luis says, I've been here for a year. I don't understand the model. These other affiliated companies are losing money. They're hemorrhaging money at like $200 million a year. Can you tell me how it works? Lopez knows how it works. He knows the money is coming from the bank. And he says, no, you'll just have to ask Mr. Davis. But, I mean, wouldn't that be something for a cross-examination if they had an expert that says they have no duty to disclose, go into details about, well, exactly what do you mean what should be disclosed and what doesn't have to be disclosed and at least let them have the opportunity to present somebody that says under some situations there is no duty to disclose. It seems like that was completely denied to them. I just think, Judge, that the manner in which they wanted to do it was going to be so confusing to the jury to make it seem that this was some accounting duty case. And I would just maybe use a quick example. I know we're spending a lot of time on the expert issue of, you know, if this were a – these gentlemen helped Mr. Stanford rob his bank and rob his bank customers' money. If there were a bank robbery going on and the getaway drivers, as they're leaving the bank, say, hey, maybe we should pull over to this substation and tell the police, let's disclose that we're the robbers of the bank. And the others say, no, no, no, let's not do that. And then they continue on and they complete the robbery and don't tell anyone. Would anyone say that the getaway drivers are not culpable because they, you know, recommended disclosure? It's really the same thing. This is not a legitimate robbery. It's the robbery you're pursuing and not the failure to go to the police. Absolutely. That's what the entirety of the case is. And the duty to disclose, to be clear, that these experts were going to talk about, was not as far-reaching as disclosing the $2 billion in general to everybody and their brother. It was the question of whether the items booked as loans are going to be revealed as loans in these particular statements that were made. Well, and let's be clear. Nothing was booked as a loan. That's where these men were hiding it and they were covering it up because they weren't booking it as a loan. The problem with this analogy is that the way that they are driving the car, even while you're telling us the most egregious thing, the way they're driving the getaway car is what they're reporting on documents, whether they're booking a sham accounting entry, whether they're booking a phantom capital contribution. It's all about what has to be put and disclosed on the documents. That's the only way that their role in the robbery is. And so they get to say whether they're driving the car or not. And so every single thing you've said involves disclosure in documents. And so they get a chance to say we didn't have to disclose that or we could record that, and that's a proper accounting method to record that. And let me be clear, Judge. I think they're affirmatively taking steps that go far beyond disclosure. What you've listed are only disclosure. Booking a sham capital contribution, well, you get to say is it a sham? How you book that, it's how you book that. Is that an error to book it that way? Is it a good faith error? Is it a complete fraud and you can't book it that way? They get to call an accountant to say you can book it this way or not. Well, they did call an accountant who did testify about that. I mean, Mr. Jones did testify about the capital contributions, and we cross-examined him and said, and it's true that if you book it so far in advance with no support, that can be fraud. And he said, yes, and that's what happened here. So they were not denied. This is not a case where they offered expert testimony, the court denied it in toto. I would suggest that the court made a learned judge, made a very reasoned analysis, exercised its discretion and proper gatekeeping function, and I would just mention to the extent there was any error, it was certainly harmless because the defendants, again, essentially conceded their knowledge of the misuse of the money by Mr. Stanford, and they tracked how that money was spent on all the things that were in contravention of the bank's representations. But knowledge is not enough. I agree, Judge, and I'm not suggesting all they did was know about it. They actively worked behind the scenes. They were instrumental in making the accounting entries that went to the public that would deceive them into believing their money was being invested. About the deliberate ignorance, which addresses these IB-5s and the supposed lack of knowledge of the IB-5s, what is your answer to the point that they say they're not being prosecuted for lying to the Antiguan authorities and therefore why do we care about the IB-5 and therefore why do we need the deliberate ignorance? Judge, we sought the deliberate ignorance instruction because they pursued a defense at trial that the so-called loan was part of the investment portfolio. The problem with that defense is that they could not maintain that defense without falsely disclaiming actually seeing the IB-5s because the IB-5s list out all the investments, and guess what? It doesn't include anything about a loan, and so they could not maintain it. It's not about an element of the crime. It's a defensive thing. You get the deliberate indifference if it's about an element of the crime. This is not about an element of the crime. Well, and we would take the position that it is in terms of if they believe the loan is part of the portfolio, if we can disprove that they believe the loan is part of the portfolio, they know that it's being misused. It goes to the question of knowledge and intent. And let me just be very clear. Yes, Your Honor, but let me be very clear. We argued this. We emphasized this so little. I think there's 15 lines of argument out of 5,000 pages of transcripts, and we said about what I said right there, you know the loans weren't in the portfolio, and they had a chance to look at it. Do we need to send a message on deliberate ignorance by reversing on a case? That's what your opponent says. I do not, and I would just stress, Judge, this is not a deliberate ignorance case. We didn't argue it. This isn't an instance like a – Well, then it shouldn't have had a deliberate ignorance instruction. If it's not a deliberate ignorance case, it didn't need the instruction. It's just the sort of instruction that nudges juries in close cases, and that's why we say you should be so cautious. You just said it's not a deliberate indifference case and that you only did deliberate indifference for 15 lines. That cuts against giving the instruction. Well, and, you know, in retrospect, maybe we shouldn't have asked for it, but I would say that, number one, we did not rely upon it. I think it matters how we argued it. It just does. We did not emphasize this instruction, and it's not something that we hung our hat on. It doesn't matter whether you emphasized it or not. Once it's given, it's the court, the imprimatur of the court, telling the jury how to decide the case. And I would also just suggest, again, that their actual knowledge was so extreme that any error would be harsh. Let me ask you about the sentence. It really seems like these guys got left holding the bag, who are, at best for your case, cogs in the system. Yeah, under your theory, they facilitated this crime, but they are minor players compared to Davis and certainly Stanford, maybe even this lady, Laura Holt, or whatever. And they got the book thrown at them. Now, I understand they're not in the same position as Davis because they didn't plead, but, man, you know, that's a lot to pay for exercising your right to trial. So can you defend this sentence? Yes, Your Honor. Look, Mr. Davis, we asked for 10 years for him. Judge Hittner gave him five because he pled quickly. He cooperated against Mr. Stanford and in this trial. He was one of the only people. He was the only person who cooperated in this case. He was one of the only people left who could explain the entirety of the story. Mr. Hewlett had died. Mr. Failing had died. And he testified in two lengthy trials for eight, nine days. And Judge Hittner, in his discretion, credited that cooperation and gave him that sentence. We asked for a sentence of 25 years for the defendants because they were an instrumental part of Mr. Stanford being able to perpetuate this fraud. He simply could not do this without accountants who were willing to go along with it and make all the entries in the bank's books and records. And, you know, so I think you can defend this sentence. And, you know, to go to motives, did they get the money out of it? No, but they had not as much as Mr. Stanford, but they got six-figure salaries, steady promotions, and at the collapse of the entire bank and the entire organization, Mr. Kurt was telling people he was going to be the next CFO and Mr. Lopez was going to be on a board. We got paid $25,000 per meeting to sit in board meetings. What about the $2 billion? Why is that the right amount? Well, the $2 billion, I think, Judge, I think you're It has to be attributable to them. It has to be for their part. And, I mean, we narrow it. It's not the entire amount always. It has to be what they're involved with. Well, so the entirety of the scheme is a $5 billion, $7 billion Ponzi scheme. We charged them with Mr. Stanford's $2 billion misuse, which they specifically tracked in Governance Exhibit 1599. And so there was some of that money that Mr. Stanford had stolen prior to, you know, in 1997 when they both came on board and prior to 2000. But once they became involved with the scheme, it's about what was foreseeable to them. And they knew exactly how Mr. Stanford was misusing this money. I think that the loss is quite easy in this case, that it's Governance Exhibit 1599 and specifically tracking all the ways that this money was misused. Thank you. I appreciate it, and thank you for coming. You're one of the few trial attorneys that we get to see up here. Many times we have the appellate sections of the U.S. attorney or public defender trying to explain the actions of their colleagues. So it's nice to have someone who was actually in the trial. And maybe your cross-examination this morning is why others don't choose not to come. Maybe I'll let him come next time. Your Honor, I was also the trial lawyer for Mr. Lopez. So let me just try to be brief because I've got two minutes, I think, two minutes, 15 seconds or so. Dr. DeRionne's seemed to be, his qualifications seemed to be challenged by the government. I would point out that he taught for 27 years. It's not his qualifications. It's whether any expert can talk about how the things actually happened at a company, whether that's a proper expert. He's not saying that the man has not done enough in accounting work to be an accounting expert. I thought that there was a question by Judge Elrod that prompted that. Okay. Well, we're not going to argue what was said. That's how I heard it. Well, then very briefly, let me just tell you, without going into a lot of detail, he taught at Rice for 27 years. We know this. Okay. I wouldn't waste your time on it. All right. There was a question about did someone testify on whether there was no duty to disclose. The answer to that was zero. No, there was not. And he just told you. Mr. Davis, who was? There was no duty to properly keep these books and records. They could sit there and facilitate sham transactions, inflated values, money being taken and listing it as something else and act like all of that's okay. They could do that as accountants. That's perfectly fine. No, that's not our position. Our position, the question was did anybody else testify to see if Dr. Durand's testimony would be cumulative? Did anybody else testify there was no duty under the accounting principles to disclose? The answer is no. He was the only one. But the no duty to disclose is specifically this issue of a loan to shareholder. That's correct. It wasn't all this other stuff about whether the properties in Antigua are inflated and all this kind of stuff. That's right. We're talking about duty to disclose. And I want to emphasize that Mr. Davis got five years. That's not in the briefing portion of the government's brief when they start responding to our sentencing claim. They don't even tell you how many years he got. We have pretty wide sentencing disparities among people based on whether somebody pleads or they don't, you know, cooperation and all that. Other people like Solis, I think, got a really large sentence where people who were really involved in crimes, heads of major companies that fell in Houston, get the same or smaller sentence than people like Solis who wasn't personally benefited at all. So we have that, unfortunately. I understand. Or fortunately, depending on who thinks that's good or not. That's why somebody like Davis would cooperate. Well, we rely on our brief, particularly our reply brief and the chart in there, and also the unwarranted disparity. We don't think that five years when he got over $16 million is fair substantively to a 20-year sentence for somebody who made a total over the whole 12 years he was there of approximately $2 million. What did Festow get? I'm sorry? How many? Never mind. It's irrelevant. I'm just saying there are a lot of variances in these sentences when people are personally involved. Right. The deliverance ignorance instruction this court held in Velazquez, Lara Velazquez, has a danger that a jury might say that they could find that the defendant should have known. And we think that that's basically why it was asked for. It wasn't needed in this case, but it had that danger. And we ask you to tell the district courts they shouldn't be using these deliverance ignorance instructions when they're not needed, when they're not needed. And whether or not the government thought the expert testimony was relevant or not relevant is not an issue. The bottom line is that this IV-5 report that's at government exhibit 691 attachment, if you look at it, there are no specific investments listed there. There's none. You can't look at there and see what the securities are at all. That's the attachment there. And then I'd like to just leave. Whether the government thinks that the expert's testimony was relevant or not should not deny a defendant his Sixth Amendment right to present a defense. And that's what was harmful about that exclusion of that expert testimony. Thank you, Mr. Zimmerman. Mr. Kretzer, I'm sorry, but Mr. Zimmerman used up your time. I'm just kidding. Go ahead. Come on down. You have three minutes. Thank you, Judge White. I gave fast out six years, Judge Alright. I don't recall that for a fact. Professor Wigmore famously said, the law of evidence, a brick is not a wall. I do not contend that Mr. Jones' testimony or any one of the district's subject areas was necessarily a magic arrow. What I do contend is that it pushed the jury, because we were not able to present the defense as we've been told we would have, more strongly towards that guilty verdict, maybe even than the deliberate evidence construction. This, to my mind, Judge Albright, converges on one sentence from the expert's report. Quote, in my opinion, someone in Kurt's position would have been properly performing his duties in an ethical manner by keeping track of the loans and advising the CFO of the need to disclose them in an annual report. That was the one sentence. That was page record site 1531. Keeping track of the loans. 1531? That's correct, yes. That was from the expert's original report, in the middle of the fourth paragraph. In that same paragraph, Your Honor, I think I heard Mr. Vornado say that, oh, well, the problem was these experts were just kind of, you know, synthesizing out of some general ethereal requirement that nobody knew where it was. Well, the problem, direct quote, there is obviously enough ambiguity in IAS 24 that extremely qualified and well-experienced professionals could differ in their interpretation of that standard. This is not some made-up, nebulous thing. That's the exact same page, Judge Haynes, 1531. With regard to Mr. Vornado's contention, I like this metaphor about this bank robbery. Well, the problem is he says this was never meant to be a loan and everyone knew it. I produce on page 16, although there's dozens of them in the record, things called promissory note dated. This is the exact title. Usual prompt for value received. Not too many of those bank robbers that Mr. Vornado is talking about leave receipts in lobby of the bank on their way out. And the expert talked about that, too. If you're going to try to hide this gigantic theft of this money, why would you document these loans? That was — these are alternate theories that we believe the jury should have been allowed to consider as they considered our — you know, if we were allowed to fairly present our case. Judge Haynes, you asked me specifically where do we find, point by point, what we would have — you know, the Daubert — The basic heart of it. Yes. I don't need all that. I know there's hundreds of pages. No, no. I mean, this is actually not — this is, by my count, 73 exact pages. It starts at page 6425. This goes late into the evening. That's in the exact page, Judge Owen, where — this is a direct quote from Judge Hittner to Mr. Vornado. If it ought to get in or it marginally can get in, the government ought to back off. End of the direct quote. The judge knew he was playing with fire here. I think when Judge Elrod asked specifically what were the grounds upon which Judge Hittner excluded, you know, A and B and C, that is not there because what happened was they recessed late in the evening. I think it went to like 8 o'clock. Everyone was tired. They came back the next morning. Judge Hittner immediately said, here's my ruling. He spoke quickly. Mr. Kuniansky even said, Judge, can I have a break here to analyze your ruling? His exact words were, no, sir, we're ready to go. That's a direct quote. So there was not a, you know, explanation of what factors the judge keyed in on. In my rapidly diminishing time, Mr. Vornado said that in the judge's October order, he specifically said that our ability to present this expert testimony was contingent on the government establishing A or B or C. That direct part of the order is at page 2003, 2004. It's only a 10-page order. There is not a word. I reread it on my iPad here after Mr. Vornado brought it up. There is not a word about some contingency if the government does this, that, or the other. It says, may be admissible if, one, a foundation can be laid showing the expert has requisite qualifications, and, two, the defendants have established relevance for such information. Therefore, the government's motion, what a hypothetical person, must be denied at this time, quote, the court will consider the admissibility of this information on a question-by-question basis. That is the paradigm with which we, the defendants, Mr. Kirk, walked into his defense. That's the paradigm we expected to present after he had testified, and that is the exact, again, in Judge Hittner's own word, the channel down which the defendants were stuffed that he himself warned the government not to do because they might be standing here exactly where they are today trying to defend the way they extirpated, traduced, whatever word you want to call it, the defendant's defense in this case, such that they were not able to have their fair shot at, you know, telling their version of the story. Thank you, Mr. Kirk. And thank you. You're court-appointed. The court appreciates your service to the court. Thank you. Okay. Thank you. Thank you all.